LAFLIN *vs.* HERRINGTON ET AL.

The sheriff sold land under an execution against the representatives of the deceased owner, the heirs having a right to redeem in one year. The agent of the purchaser, within the year, assigned the certificate of sale to one of the heirs, who was acting for the rest, and who gave his note for the amount, but did not pay it at maturity. The transaction, though it was not approved, was not disaffirmed by the purchaser within the period allowed for redemption; *Held*,

That a person who bought the title of the original purchaser several years afterwards, when the land had greatly risen in value, could not recover it as against the heirs or their vendees.

Walter Laflin filed his bill in the Circuit Court of the United States for the northern district of Illinois, against the widow and heirs of James Herrington and the Illinois Central Railroad Company, complaining that one William Stuart obtained judgment in the Circuit Court for Kane county, Illinois, 9th June, 1837, against James Herrington, for $646 72, and issued execution thereon within one year thereafter, which was returned by the sheriff *nulla bona;* that afterwards James Herrington died, leaving a widow and ten children, (the defendants,) the widow becoming his administratrix; that James Herrington died seized of certain described lands; that afterwards Stuart notified the administratrix of the judgment and of his intention to issue an alias execution; that he did issue such execution, levied upon the land, and after due advertisement it was sold to William H. Adams for $1,378 42; that Adams being a friend and relative of Stuart, made the purchase for him; that Augustus M. Herrington, one of the heirs of the deceased James Herrington, proposed to redeem the land for himself and the other heirs, but in order to overreach an outstanding title for a fractional interest, requested an assignment of the certificate of sale to be made by Adams; that Adams made an assignment with a blank for the name of the assignee, and instructed his attorney, Burgess, to deliver it to Herrington when the money was paid; that Herrington (though he knew that Adams had bought for Stuart) got the assignment

from Farnsworth, the partner of Burgess; that he got the paper by falsely representing that the land had been incorrectly described, and gave his notes for $2,378 42, payable to Burgess & Farnsworth, agreeing, that if the arrangement should not prove satisfactory to Stuart it should be void, and the certificate, with the assignment, be returned to Farnsworth; that Adams repudiated the arrangement as soon as he heard of it, and wrote to Stuart, who immediately replied, expressing his disapproval in a letter which was read to Herrington before the expiration of the time for redemption; that afterwards, on the 9th of October, 1856, Adams sold and transferred the certificate of sale to Julius Smith, who, on the 20th of November, 1856, conveyed to the complainant; and that the heirs of Herrington in December, 1856, conveyed an undivided interest to the Illinois Central Railroad Company. The bill prays that the defendants be required to deliver up the certificate of sale so that the assignment may be cancelled; that they be restrained by injunction from placing the certificate on record, from filling up the blank in the assignment, from making any claim to the lands, or from demanding a deed of the sheriff; that the sheriff be directed to make a deed to the complainant; that the defendants be decreed to have no title, and required to release all title which they may appear to have.

The facts, as they appeared from the answer and the evidence, are set forth in the opinion of Mr. Justice *Wayne* too fully to need repetition here.

*Mr. Reverdy Johnson*, of Maryland, and *Mr. Burgess*, of Illinois, argued the cause for the appellants.

*Mr. Beckwith*, of Illinois, for appellees. 1. The judgment against James Herrington not having been revived against his heirs, the execution was a nullity and the sale void. 2. It is not true that J. M. Herrington got the certificate fraudulently. 3. The appellant, by his own showing, is simply a purchaser of the right to set aside a legal instrument, and has, therefore, no standing in a court of equity. 4. Adams being clothed with the legal *indicia* of ownership, though he was, in

fact, only an agent of Stuart, had power to bind his principal. 5. Stuart ratified the act of Adams, and the subsequent attempt to repudiate it came too late. 6. On the part of the complainant this is a mere speculation; all that is really due to Stuart was tendered, and is now in court for his use. 7. The complainant cannot have the contract with Herrington rescinded without placing the appellees *in statu quo*, which would permit them to discharge the debt and redeem the land.

Mr. Justice WAYNE. We shall confine ourselves to such of the facts of this case as are sufficient to illustrate the point upon which we will decide it. Others have been insisted upon in the argument, but, in our opinion, they have no substantial bearing upon the merits of the controversy.

The complainant and the respondents have chosen to put their respective rights to the land in dispute upon the sale of it, to satisfy the judgment of Stuart against J. Herrington, each claiming the sheriff's certificate of sale by fair purchases, the former, however, charging that the purchase of the latter had been obtained by the fraud and circumvention of Augustus M. Herrington, their co-defendant, without accusing any of the rest of them with complicity in the transaction.

It is recited in the bill that a judgment had been recovered by William Stuart, in the year 1837, against James Herrington, for six hundred and forty-six dollars and seventy-two cents. That an execution issued upon it, within the year of its rendition, commanding the sheriff to make the money out of the goods and chattels, lands and tenements of the debtor, and that the sheriff had returned it to the proper office, with the entry upon it, "that he could find no property of the defendant whereon to levy." This occurred in the lifetime of James Herrington. He died in the year 1839 intestate, leaving a widow and ten children.

The probate court of Kane county granted to his widow letters of administration upon the husband's estate. It is against her, as administratrix, and nine of these children, one of them being dead, and the Illinois Central Railroad Company, that this suit is brought. The answer of that company

*Laflin vs. Herrington et al.*

makes it unnecessary to notice it further in this opinion, except in confirmation of the fact that, at the time it bought its interest in the land in controversy, and when the complainant bargained for his, it had become a subject of speculation.

Nothing was done for several years after the sheriff's return upon the execution, and the death of the debtor, to collect the debt.

But when it had been judicially determined that the debtor had died seized of the land in controversy, Mr. Stuart, the judgment-creditor, empowered his friend and brother-in-law, William H. Adams, to take such means as were necessary to subject the land to the payment of his judgment. Adams accepted the agency, and employed Messrs. Farnsworth and Burgess, attorneys at law, in the case. They conducted it with the knowledge of Adams of every thing which was done, and with the acquiescence of his principal, Stuart. The counsel served a notice upon the widow and administratrix of J. Herrington, informing her of the unsatisfied existence of the judgment, and that they would apply in three months, at the clerk's office, for an alias execution. They did so, and the execution was issued and levied upon the land. It was sold by the sheriff, in four parcels, for the aggregate sum of $1,378 42, subject to a right of redemption in one year, by the payment of the sums due, with accruing interest and the costs. Mr. Burgess attended the sale at the request of Mr. Adams, and bid on the land to the amount of the execution and costs, in his name, for the benefit of his principal, Mr. Stuart.

Mr. Burgess, as counsel, directed the sheriff to make the certificate of sale to Mr. Adams, and that having been done, he received and retained it. The purchase and retention of the certificate of sale by Mr. Burgess was approved by Mr. Stuart, it being understood it was to remain in the hands of himself, and his partner, Mr. Farnsworth, subject to the right of redemption, or to an assignment of it to a purchaser, as Mr. Adams might direct.

Shortly before the expiration of the time allowed by the law to redeem, Mr. Burgess told Mr. Adams that Augustus M. Herrington, one of the children of the judgment-debtor, and now

a respondent to this bill, wished to redeem the land by paying the amount due upon the certificate of sale, and wanted an assignment of it to himself. Mr. Adams directed Mr. Burgess to write the assignment. He did so, leaving a blank for the name of the assignee, and a figure wanting for the date of the year, which Mr. Adams signed, giving a direction to Mr. Burgess, the latter assuring him it should be observed, that the certificate, with the assignment upon it, should not be given up until the money had been paid.

Either late in January or early in February, 1856, Augustus M. Herrington went to the office of Farnsworth and Burgess, the latter not being in, and he stated to Mr. Farnsworth his desire to get further time than the last day of redemption for the payment of the money due upon the certificate of sale. To this application Mr. Farnsworth says: "Knowing that there had been some conversation to transfer the certificate to A. M. Herrington, and that there was an assignment in the office for that purpose, the transfer of the certificate was made to him upon his giving his note of hand and a due bill in payment, the note being ante-dated as of March the sixth, 1855, with interest at ten per cent. to be paid on the 1st September, 1856, to Farnsworth and Burgess; the due bill being for one hundred dollars 'and a trifle over,' which was paid in a short time afterward, the amount of it being the fee due to Farnsworth and Burgess by Mr. Stuart, for their services in the case." Mr. Farnsworth filled up the blank in the assignment with the name of Herrington, added the figure 5 to give that year as the date of the note, and concluded it, contrary to the fact, with the words, "*for money actually loaned.*"

Mr. Farnsworth declares, in his evidence, that the transfer was made and the note taken in good faith, for the benefit of Mr. Stuart, and for no other purpose than to give to Herrington the ownership of the certificate.

Some days after it had been done, Herrington went to the office occupied by Adams and by Farnsworth and Burgess for the transaction of their respective businesses—that of Adams being to buy and sell land—when the transfer of the certificate to Herrington became the subject of conversation, both

of the counsel and Adams being present. Adams then said to them and to Herrington that he was satisfied with the arrangement, but that he being only an agent, he would write to his principal about it, and if he did not object to it, that he would not. He did write, and received a reply from Mr. Stuart, complaining of what had been done, which was shown to Mr. Herrington on the 5th of March, the day before the expiration of one year from the date of the sale of the land.

But whatever may have been his discontent with the arrangement, that letter and other testimony in the record show that Mr. Stuart did not then intend to disaffirm it, but was content to take the chances of the payment of Herrington's note; at the same time holding his counsel responsible for the debt, if the note should not be paid at its maturity. He also required from them the deduction of their commissions on the amount "collected or to be collected." No complaint was made again of Farnsworth's arrangement by the parties interested in it, until after Herrington's default in payment of the note.

Six months had intervened, when Herrington received a letter, with the signature of Farnsworth and Burgess, urging him to pay the note on account of a letter which they had received from their client, Mr. Stuart. The letter was sent to Herrington, with a request for its return. Burgess and Farnsworth are charged, in that letter, with having given the certificate to Herrington without the knowledge and against the consent of Adams, and in violation of the assurance given by Mr. Burgess, that it should not be parted with by him until the money had been paid. The writer then says, that he had written to Mr. Adams to employ at once some able and honest lawyer—if he shall have the luck to find one—to take immediate measures to settle the matter. And he concludes by telling his lawyers that his confidence, and that of Adams, had been abused, and that if he should be compelled to go to Chicago again on the business, he would expose the whole affair. Then it appears, that up to the date of that letter—six months after that of the previous letter—there had been no actual disaffirmance of Farnsworth's arrangement with Herrington for the certificate of sale; and that all the parties

knew it had been transferred by that arrangement, in virtue of Herrington's right to redeem the land, for the benefit of himself and his mother, and his brothers and sisters. Stuart, Adams, and their counsel continued to anticipate the payment of the note, and the latter were allowed to retain it for payment, without the dissent of Adams or his principal. But, after it was past due for more than a month, the counsel wrote to Herrington a singular letter, without taking notice of any of the other respondents to this bill. They say they "were under the necessity, owing to Mr. Stuart's refusal to ratify the arrangement made by our Mr. F. with you about the certificate of sale of what is called the Laflin property, to refund the money you paid to Mr. F., about the 28th of January last, of $108 34, with interest, amounting to $116 48." Still, Burgess, acting as counsel of Stuart, in writing the letter just read, which was done with the full knowledge of Adams, made no offer to surrender Herrington's note.

The case subsequently shows, that the note was retained by Mr. Burgess, for the security of himself and partner against any claim which might thereafter be made by Mr. Stuart upon them for the money due him, in the event of his successfully carrying into execution his menace to make them responsible for the debt, and with the further intention to use the note to coerce the payment of it out of the land. By this time, however, the land was supposed to have become a good object of speculation. Mr. Burgess and Mr. Adams knew it to be so; for, before the letter had been written to Herrington, announcing to him, for the first time, that Mr. Stuart would not ratify their arrangement for the transfer of the certificate to A. M. Herrington, Mr. Burgess had already become the lawyer of the complainant, Mr. Laflin, for the purchase of the land, with the intention to divest the respondents of all right to the certificate of sale. We think that a moment's professional consideration, unaffected by any resentment of Mr. Burgess against Herrington for the non-payment of his note, would have suggested to him that having himself fully assented to what he represented as his partner's arrangement for the transfer of the certificate, that, so far as he was concerned, it had given to the

Herringtons an equity to the land, which it might not be professionally becoming in him to attempt to defeat, by his agency for the purchase of it for another person. He must have known that, under the circumstances, equity would coerce the respondents to pay the amount due upon the certificate, as the condition upon which they could ever get the sheriff's title to the land. Moreover, he knew that there were then persons offering to buy the land, at a larger sum than the certificate called for, amply securing his principal, Mr. Stuart, and himself and his partner, from all loss. And, further, he might have concluded that any one purchasing, either from Mr. Stuart or Mr. Adams, with a full knowledge of all the circumstances of the transaction before he bought, could not acquire any right in himself, by the purchase, to defeat the previous equity which had been obtained by the representatives of the judgment-debtor, in the exercise of their legal right to redeem the land from the operation of the certificate of sale. The evidence also shows that the complainant, Mr. Laflin, knew all the particulars of the judgment; the subsequent proceedings upon it; the sale of the property to satisfy it; how the certificate of sale had been given by the sheriff, and to whom, and for what purpose; the subsequent assignment of it to A. M. Herrington, in behalf of himself and his father's family; the agency of his counsel, Mr. Burgess, in the whole affair; and the course of Mr. Stuart and Mr. Adams, in respect to it, when the former conveyed to the complainant his interest in the land.

In our opinion, there never was, either by Mr. Stuart or Mr. Adams, or by their counsel, any effective disaffirmance of the assignment of the certificate to Mr. Herrington; and if either of them meant to do so, we think that no act of theirs, either separately or conjointly, could, under all the circumstances, have defeated, in favor of Mr. Laflin, the previous equity to the land, which had been acquired by the respondents. Laflin stands in no better condition than Mr. Stuart did, when his equity in the certificate had been conveyed to others by those who represented him, for a consideration which they chose to retain, with his knowledge, if not strictly with his consent, in

expectation of its payment, until after the time when the right of the assignees of it to redeem the land had passed. The latter, by that course, might well have supposed, and as they did think, that they had an equity in the certificate, not liable to be annulled at the pleasure of those from whom they had acquired it, upon the plea that there had been a failure to pay the money on the day stipulated, and that its non-payment at that time, of itself revested Mr. Stuart with the original, but contingent equities to the land, which the purchase of it, at sheriff's sale, had given to the judgment-creditor. The non-redemption of the land would have made Mr. Stuart's right absolute, upon the expiration of the time allowed; but having made the certificate of sale the subject of speculation and sale before that day, with a postponement for the payment of the consideration of the transfer for a longer time, neither Mr. Stuart nor Mr. Adams, as his agent, can, with any propriety, be considered as having had a right to retain, at the same time, both Mr. Stuart's claims upon the land, if the money should not be punctually paid, and also their transferee's obligation to pay it when due. Indeed, we doubt, without intending ourselves to be finally concluded upon the point, as it has not been so decided by the courts of Illinois, if, under the law of Illinois giving to a debtor the right to redeem his land sold under execution, if even an agreement had been made between these parties, which did make the right to redeem conditional upon the payment of a consideration in money, after the time to redeem had passed, and that, if not then paid, that the creditor should have the right to exclude the debtor from doing so, whether a court of equity, if called upon to adjust the rights of the parties under such a contract, would not, in consideration of the intentions of the legislature in giving to debtors the right to redeem, feel itself bound to dispose of the case, by making the debtor pay the amount due, with interest, and all costs which might have accrued in the litigation.

But how, in addition to what has been said of the disability of Mr. Stuart to convey, at the time it was done, any right to the land to the complainant, and the latter's inability to obtain any such right, in consequence of his knowledge of the cir-

cumstances, when he took Stuart's conveyance, there were incidents in this affair, happening subsequently to the assignment of the certificate to Herrington, produced by the course taken by the complainant and his counsel, Mr. Burgess, and by Mr. Adams and Mr. Smith, who now appears for the first time in this business, which are certainly not calculated to strengthen the complainant's claim to the certificate of sale against the better equity of the respondents.

The course taken by the complainant to get the ownership of the land was to buy it from Mr. Stuart, expecting, if he succeeded in doing so, that Mr. Adams, having no interest or claim upon it, would, as Stuart's agent, transfer to him the certificate of sale which the sheriff made in his name, only, *as he says in his testimony,* for the benefit of Stuart. The case, however, shows that Mr. Adams would not or did not do so, and that he assumed, in eight days afterwards, and when he knew that his principal had conveyed to Laflin, to be the owner of the certificate, and conveyed the same land to Julius C. Smith, authorizing him to receive a deed for it, in his own name and to his own use, from the sheriff, in virtue of the certificate of sale, and then remitted himself to Mr. Stuart sixteen hundred dollars, the consideration which Laflin was to have paid Mr. Stuart, but which had not been done, though said in the deed that it had been.

Now, there are certain facts in connection with Stuart's deed to Laflin and Adams's to Smith which must be mentioned, and particularly so, as they are mostly derived from the testimony of Mr. Adams:

1. Mr. Burgess acted as the agent of Walter Laflin, the complainant, in the negotiation between Smith and Laflin, for the purchase of the property, and for the procurement of the deed from Stuart to Laflin. "Do not recollect who informed him so, but thinks it was Mr. Burgess."

2. The deed from Mr. Adams to Smith was executed, the latter being acquainted with the dispute that had arisen concerning the property and with the circumstances attending the transfer of the certificate to the Herringtons.

3. Smith knew when Adams made his deed, and when he

accepted it, that Adams was only the agent of Stuart; that he had nothing in the land to convey; that the certificate of sale, which he was then professing to sell him, had been issued to him only as the agent and for the benefit of Stuart; that it had been already assigned, with his signature, to A. M. Herrington, and when the deed was made to Smith, on the 9th of October, that both himself and Adams were then aware of the fact of Stuart having sold his interest in the land to Laflin on the 1st of the same month. The title to the land, then, as between Stuart, Laflin, Adams, and Smith, stood thus: that the second had the first title to it, and the latter, that of Mr. Adams, the agent of Stuart, who had not at the time any property in the land, or any delegated authority from Stuart to convey it to Smith. We know not what were the inducements of Mr. Adams to make a transfer, under such circumstances, to Smith; but when he gave his testimony in this case, it would have been better for all parties concerned if he had given a full explanation of the transaction. It was, however, not done. But Smith accepted the conveyance, and brought a suit against Augustus M. Herrington and others for the property; and he states in his bill, that William H. Adams, for a valuable consideration *paid, and agreed to be paid,* had assigned the certificate to him. His suit was filed two days after the date of the conveyance to him. Thus matters stood until the 20th November of the same year, just one month, when he conveys the property to Walter Laflin, the complainant, for the sum of thirty thousand dollars, for which he had agreed to give sixteen hundred, the exact sum which Adams remitted to Stuart when he conveyed to Smith. Our object in giving the narrative of the transfers of this land has not been to ascertain whether all of the persons who have been mentioned were in combination to divest the Herringtons of their equity in it, but to show the fact that there was such a combination for speculation, which a court of equity will not countenance. The conveyances to Laflin and Smith were made by Mr. Stuart and Mr. Adams before the letter of the 23d of October, 1856, was written to A. M. Herrington by Farnsworth and Burgess, letting him know that Mr. Stuart

had refused to ratify their arrangement for the transfer to him of the certificate of sale. Mr. Smith's suit was also brought before that letter was written. Mr. Burgess had negotiated the sale from Stuart to Laflin on the first of October, and in that letter, of the 23d of the month, calls the land, for the first time, the Laflin property.

Mr. Burgess also knew that Adams's transfer to Smith was executed on the 9th, and, as early as the 11th, he became the counsel of Smith in the suit against the Herringtons, notwithstanding he had before bought the property for Laflin, then being at the same time the counsel of Laflin and Smith, in respect to land for which they had to all appearance antagonist claims, which was acquired through his agency, his situation as to each of those persons being known to Adams when the incidents occurred which have been just mentioned, and, cf course, before the letter of the 23d of October was written t ) Herrington. Further, we find in the record proof of his rej - resentation of Laflin and Smith, and with their consent at the same time, in the fact that after Smith's suit had been allowed to stand for six weeks, that Smith consented to give a quit-claim deed for the land to Laflin, for which the latter was to pay thirty thousand dollars, and that the litigation between Smith and Herrington was immediately transferred to Laflin, under the professional direction of Mr. Burgess.

All the foregoing facts, in connection with the evidence that this land had then become very valuable, convince us that there was a combination to deprive the Herringtons of their equity in it, by using the fact of the note of A. M. Herrington not being paid at its maturity as a pretence for doing so. Mr. Allen, engaged in the real estate business, says that he knew the land; that he knew it as the property contested between Matthew Laflin and Herrington's heirs, and thirteen acres of it, running from State street to the lake, comprising what was known as the Herrington tract; that it had seven fronts—one on State street, two on Wabash avenue, two on Michigan avenue, and two on Indiana; he thinks that in each front there was about six hundred feet, and that its value in March, 1856, was one hundred and twenty-five dollars per front foot.

That may have been an exaggerated estimation; but whether so or not, it serves to show, especially as it was not controverted as to the amount, that all the persons concerned in defeating the equity of the Herringtons—and they were also dealers in land—were in combination to effect that object for a speculation, and that Mr. Burgess gave to them his professional services to accomplish it. Now, it is not meant by us, that the buying of land with the expectation of selling it at an advance in price is wrong of itself, any more than that the purchase of merchandise is so, when made by the anticipation of its rise by the happening of political events, or by foresight of what will be the demand for consumption at a future day, and a deficiency of supply; but the difference between them is, that the latter is a triumph of sagacity, which gives life and energy to all trade; but that to buy land for speculation, upon a combination to divest the right of another to it, is a contrivance to fulfil the designs of selfishness;

We have given the facts of this case plainly, in connection with the assignment of the certificate of sale to Herrington, and the subsequent attempts which were made to divest his interest and that of his family in it, and necessarily with the names of all the persons concerned in them. That of Mr. Burgess occurs frequently under circumstances that call for a further remark. We do not mean it to be inferred, from anything that has been said, that, in the combination to make the speculation out of the property, he had any prospective pecuniary expectation or interest in its results. There is no evidence of that in the record, and there is that he advocated zealously the causes of his new clients—perhaps from temperament of character, perhaps from resentment to the Herringtons for the non-payment of the note at its maturity, which A. M. Herrington had given to Farnsworth and himself for the certificate of sale; but, be that as it may, we think, considering what had been the relations between himself and partner with A. M. Herrington in this matter, in appearing in court against him and his family for others in the same business, that he was not sufficiently mindful of the restraints imposed by prudence upon lawyers in making engagements with their clients;

which cannot be disregarded without subjecting them to misconception and suspicion, and the profession to the already too prevalent impression that it is not practiced with all the forbearances of the strictest honesty or of the highest moral principle.

With these views, we shall direct the judgment of the court below to be affirmed.

We ought to have said, also, that there was no error in receiving the letter of Mr. Stuart to Farnsworth and Burgess as evidence, complaining of their want of fidelity as his lawyers. It was not confidential, or meant to be so, in the sense of its having any connection with the merits of the case, for Mr. Stuart had authorized it to be communicated to another lawyer, for the purpose of obtaining from Farnsworth and Burgess an immediate settlement of the debt.